SEGUROS DEL ESTADO, S.A., Plaintiff-Appellee,

v.

SCIENTIFIC GAMES, INC., Defendant-Appellant.

No. 99-14166.

United States Court of Appeals,

Eleventh Circuit.

Aug. 20, 2001.

Appeal from the United States District Court for the Northern District of Georgia. (No. 98-00968-1-CV-CAM), Charles A. Moye, Jr., Judge.

Before BLACK, FAY and COX, Circuit Judges.

BLACK, Circuit Judge:

Appellant Scientific Games, Inc., appeals the district court's denial of its motion to dismiss, wherein Appellant asserted the applicable limitations period expired and the doctrine of *lis alibi pendens* applied. Appellant also appeals the district court's grant of summary judgment to Appellee Seguros del Estado, S.A. The district court effectively determined Appellant was in breach of an indemnification agreement because Appellant did not reimburse Appellee for its payment of $2.4 million in accordance with an obligation on a bond. Finally, Appellant appeals an adverse judgment of approximately $7 million. This judgment is comprised of a principal amount of $2.4 million and pre-judgment interest at an annual rate of 38.76%.

This case involves three agreements: (1) a contract between Appellant and Empresa Colombiana de Recursos Para la Salud, S.A. (Ecosalud), a Colombian governmental entity, under which Appellant created and managed a national instant lottery in Colombia (Lottery Contract); (2) a bond which was required under the Lottery Contract, taken out by Appellant and payable by Appellee to Ecosalud (Bond);[1] and (3) an indemnification agreement which required Appellant to reimburse Appellee for sums paid to Ecosalud and for any interest paid on such sums (Indemnification Agreement). On appeal, Appellant raises four arguments: (1) in light of pending litigation in Colombia, this case should be dismissed under principles of international comity and the *lis alibi pendens* doctrine; (2) alternatively, this case should be dismissed under Colombia's 2-year statute of limitations governing insurance disputes; (3) the entry of summary judgment for Appellee

_____

[1]While this document is entitled "Bond," the terminology used in the documents at issue in this case is sometimes characteristic of language used in the United States where insurance policies are concerned and is sometimes characteristic of the language used where surety bonds are concerned. We note this only to explain our use of this language.

should be reversed due to factual issues regarding whether the Bond's effective date was extended, whether the Indemnification Agreement's term expired, whether Appellee made a valid payment under the Bond, and whether Appellee's settlement with Ecosalud was reasonable; and (4) the award of pre-judgment of interest of 38.76% per annum should be vacated in favor of either an interest amount based on Colombian pesos converted to U.S. dollars or a requirement that Appellee provide proof of Colombian bank interest paid on U.S. dollar transactions.

We affirm the denial of the motion to dismiss, the grant of summary judgment, and the $2.4 million principal judgment, but we vacate the portions of the order and the judgment related to the pre-judgment interest payment. We remand with instructions to determine the interest rate that Colombian banks would have applied to U.S. dollar deposits on November 1, 1994, and to recalculate the interest due.

## I. BACKGROUND[2]

On March 12, 1992, Ecosalud entered the Lottery Contract with (1) Appellant, (2) PKI Associates, Inc., a New York corporation, and (3) Daibutsu, Inc., a Panamanian corporation (collectively, Contractors). The Contractors formed a Colombian operating company, Wintech de Colombia, S.A. (Wintech), to run the lottery and thereafter assigned the Lottery Contract to Wintech. Clause 41 of the Lottery Contract required the Contractors to obtain a bond from a Colombian insurance company in the amount of $4 million or its equivalent in Colombian pesos. This bond was to guarantee the Contractors' performance of their obligations under the Lottery Contract, including the payment of any penalties. Appellee issued to Appellant[3] the Bond, whose initial term was from March 12, 1992, to March 12, 1993. As partial consideration for the Bond, Appellant executed the Indemnification Agreement with Appellee. This Agreement required Appellant to "immediately reimburse" Appellee for any sums paid to Ecosalud under the terms of the Bond and to pay interest to Appellee on these sums "at the current banking interest rate in effect in Colombia." An amendment to the Bond, dated May 15, 1992, provided for the automatic renewal of the policy at the end of each period until one year after the expiration of the Lottery Contract. Another amendment, dated March 2, 1993, extended the Bond's term of effectiveness through March 12, 1994.

---

[2]This Part is drawn from the district court's unpublished opinion. *See Seguros del Estado, S.A. v. Scientific Games, Inc.,* No. 1:98-CV-968-CAM (N.D.Ga. Sept. 28, 1999) (order denying motion to dismiss and granting summary judgment motion).

[3]While the initial policy lists only Appellant as the contractor, the policy amendments list Appellant, PKI Associates, and Daibutsu as contractors.

On July 1, 1993, Ecosalud issued a Declaration of Caducity, Administrative Resolution No. 246 (the Declaration).[4] In this Declaration, Ecosalud terminated the Lottery Contract based on a determination that the Contractors breached the Contract.[5] Furthermore, Ecosalud found the Contractors and Wintech jointly and severally liable and proclaimed Ecosalud was owed in excess of $4 million under the terms of the Lottery Contract. Finally, Ecosalud stated in the Declaration that Appellee was jointly and severally liable for $4 million pursuant to the Bond. The Bond provides that "[a] casualty shall be deemed to have occurred[,] ... in the event of breach of the contract, when the Administrative Resolution that declared the caducity of the contract or the breach thereof for reasons attributable to the contractor is final and binding ...." The Bond obligates Appellee, under these circumstances, to pay Ecosalud within a month following a request for payment. Appellee received notice of the Declaration on July 7, 1993, and provided Appellant with written notice on July 12, 1993.

Pursuant to the request of Appellant and Appellee that it reconsider the Declaration, Ecosalud confirmed the Declaration by issuing Administrative Resolution No. 493 on October 15, 1993.[6] On March 15, 1994, Appellant challenged the Declaration and Resolution No. 493 in a Colombian administrative court and sought temporary suspension of the Declaration during the appeal. In May 1994, the administrative court denied the request for temporary suspension. The appeal remains pending.

Following negotiations, Appellee reached a settlement with Ecosalud on September 29, 1994. The settlement obligated Appellee to pay Ecosalud $2.4 million, in lieu of the contractually mandated sum of $4 million. On November 1, 1994, Appellee paid Ecosalud $2.4 million. The next day, Appellee notified Appellant of this payment and demanded reimbursement pursuant to the Indemnification Agreement .[7]

---

[4]According to Dr. Andrew Abela-Maldonado, an expert witness for Appellant, declaring caducity is a unilateral "exercise of governmental powers reserved to Ecosalud as a governmental entity" under Colombian law.

[5]According to Dr. Abela, a witness for Appellant, *see supra* note 3, Ecosalud made this determination based in part on Wintech's failure "to deliver on its promise of monopoly status for [the instant lottery]," and, therefore, to sell the projected number of lottery tickets. Dr. Jorge Mora Sanchez, a witness for Appellee, testified only that Ecosalud "declared the termination of [the Lottery Contract] for causes imputable to [Appellant]."

[6]There seems to be an inconsequential discrepancy in the record, as Appellant believes Ecosalud issued Resolution No. 493 on October 3, 1993.

[7]C. Gray Bethea, Jr., Appellant's General Counsel, testified that Appellant "was not given contemporaneous notice ... of the private settlement entered into on September 29, 1994. We were just informed of the payment. We received a copy of the Settlement Agreement in 1995."

Appellant failed to reimburse Appellee, thereby giving rise to this litigation.

On April 2, 1998, Appellee filed suit in United States District Court, Northern District of Georgia, seeking to recover from Appellant for breach of contract and unjust enrichment. On May 7, 1998, Appellee filed a motion for summary judgment based on its breach of contract claim. Appellee sought a $2.4 million reimbursement plus pre-judgment interest on that amount at the rate specified in the Indemnification Agreement. On May 12, 1998, Appellant filed a motion to dismiss based on the statute of limitations or, in the alternative, based on the legal doctrines of *lis alibi pendens* and *forum non conveniens*.[8]

In its order dated September 28, 1999, the district court denied Appellant's motion to dismiss. Concluding that Georgia law governs, the court held the suit was not barred by Georgia's 6-year statute of limitations and that *lis alibi pendens* was inapplicable.[9] The district court proceeded to grant Appellee's motion for summary judgment. In so doing, the court concluded as follows: the Bond and Indemnification Agreement were in effect when the Declaration was issued; Resolution No. 493 rendered the Declaration "final and binding;" Appellee properly notified Appellant; Appellee's settlement with Ecosalud was reasonable; and Appellant is liable to Appellee for reimbursement of the principal amount, plus interest. The district court therefore ordered judgment for Appellee in the principal amount of $2.4 million, plus pre-judgment interest at the annual rate of 38.76%. The district court interpreted "the normal banking interest rate that is then in effect in Colombia[ ]"[10] to mean the standard rate applied to pesos, noting that Appellant knew when it executed the Bond and Indemnification Agreement "that payment was contemplated in United States dollars." This appeal followed.

## II. DISCUSSION

A.  *Motion to Dismiss*

Appellant asserts its motion to dismiss should have been granted since (1) the doctrine of *lis alibi pendens* applies due to related, ongoing litigation in Colombia, and (2) a 2-year statute of limitations under

---

[8]The *forum non conveniens* basis is not raised on appeal.

[9]The district court also denied Appellant's motion to strike specified affidavits submitted by Appellee. This issue is not raised on appeal.

[10]There are some inconsequential differences between translations of documents submitted by the parties into the record. For example, the Indemnification Agreement submitted by Appellant refers to "the normal banking interest rate that is then in effect in Colombia," while the Indemnification Agreement submitted by Appellee refers to "the current banking interest rate in effect in Colombia."

Colombian law had expired prior to the filing of this case. We affirm as to these issues.

1. *International Comity and Lis Alibi Pendens*

We review the district court's decision declining to apply the principle of *lis alibi pendens* for abuse of discretion. *See Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir.1994); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993). *Lis alibi pendens* is a doctrine rooted in international comity which permits a court to refuse to exercise jurisdiction in the face of parallel litigation that is ongoing in another country. *Cf. Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) (defining "comity of nations"); *Turner Entm't Co. v. Degeto Film,* 25 F.3d 1512, 1518 (11th Cir.1994) (discussing doctrine of international abstention where foreign court has rendered final decision on the merits, but has not issued final judgment).

Appellant argues the district court should have stayed this case in the face of the suit challenging the Declaration which is pending before a Colombian administrative court. *See supra,* Part I. Specifically, Appellant argues the invalidation of the Declaration by the Colombian court would render Appellee's indemnification claim baseless, as Appellee would have no obligation to pay on the Bond. According to Appellant, the central issue in both this case and the Colombian case is the validity of the Declaration, and Appellee and Appellant are parties to both suits and are bound by the result of both suits.[11] Deciding this case, therefore, would effectively decide the pending Colombian case and violate principles of international comity. Appellant also argues that, if this Court affirms the district court's judgment and the Colombian court subsequently invalidates the Declaration, staying this case would avoid "a meaningless cycle of round-robin litigation" in which Appellant would have to sue Ecosalud for recovery of its reimbursement to Appellee. Finally, Appellant maintains this Court should invoke *lis alibi pendens* here as we did in a related case. *See Empresa Colombiana de Recursos Para La Salud, S.A. v. Scientific Games, Inc.,* No. 97-8374 (11th Cir. Jan.27, 1998), 136 F.3d 142 (11th Cir.1998) (table).

The issue here is whether the district court abused its discretion in declining to invoke the doctrine of *lis alibi pendens*. We conclude it did not.

---

[11]Appellant's attorney, Dr. Andrew Abela-Maldonado, testified in his sworn affidavits that Appellee was found by the Colombian court to have a "direct interest" in the pending litigation, has intervened, and is entitled to file motions, request evidence, and set forth its procedural position. The "motion" filed by Appellee is its version of the facts in the Colombian case; it is not a request for judicial action. It also includes Appellee's acknowledgment that it has been summoned as a "joint litigant" and its statement that it "agrees with what will be proved at trial and with the judgment that resolves the dispute ...."

The application of *lis alibi pendens* turns on whether a court "should exercise its jurisdiction where *parallel* proceedings are ongoing in a foreign nation ...." *Turner,* 25 F.3d at 1518 (emphasis added). The threshold question, therefore, is whether this case is parallel to the ongoing case in Colombia. *See Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.,* 180 F.3d 896, 898 (7th Cir.1999). We conclude the two cases are not parallel since they involve materially different issues, documents, and parties.

At issue in the Colombian case is the validity of the Declaration and, therefore, whether Appellant breached the Lottery Contract and whether Ecosalud properly invoked Clauses 42 and 43 of the Lottery Contract. These clauses provide the bases for which Ecosalud may declare caducity and demand payment of the penalty. By contrast, at issue in this case is whether Appellee is entitled to reimbursement from Appellant under the terms of the Indemnification Agreement and, by reference, the terms of the Bond. Thus, while this case has been *precipitated by* Ecosalud's issuance of the Declaration, it does not directly *involve* the validity of the Declaration or the Lottery Contract.

Furthermore, the outcome of this case will not affect the outcome of the Colombian case, as Appellant claims. This case will determine only whether the penalty sum will be outlaid by Appellant rather than by Appellee. In other words, if Appellee prevails, the risk of the overall transaction would be transferred from Appellee to Appellant. A decision in this case would not, therefore, effectively decide the outcome of the litigation currently pending in Colombia.[12]

Next, the parties are not the same. While Appellant's expert, Dr. Andrew Abela-Maldonado, testified in his affidavits that Appellee intervened in the Colombian case and filed a "motion," *see supra* note 9, the attorney who submitted a filing for Appellee in the Colombian litigation, Dr. German EspinosaRestrepo, testified in a deposition that Appellee was not a party in the Colombian case. Rather, Dr. Espinosa testified that Appellee, as a third party with a relationship to the subject matter in litigation, was summoned into the action to state its position in the suit. Dr. Espinosa testified that Appellee, in its filing with the Colombian court, stated that "it has no relationship whatsoever with this action because its rights that arose in the payment of the obligation will be pursued against [Appellant] both based in the subrogation action [permitted

---

[12]We note that, should the Colombian court invalidate the Declaration, the court would have the option of immediately ordering Ecosalud to reimburse Appellant for its outlay. It would be feasible for the Colombian court to impose this remedy since Ecosalud and Appellant are the parties before it, and these parties should have notified the Colombian court of this Court's affirming the district court's judgment. This option would eliminate the need for Appellant to sue Ecosalud for reimbursement, as argued by Appellant.

under Colombian law] or based on the indemnity agreement like in this case in the United States." The text of the filing bears out this characterization: "By virtue of the insurer's right of subrogation established by Article 1098 of the Colombian Commercial Code, and the utilization of the counterguarantee [*i.e.,* Indemnification Agreement] issued by [Appellant], [Appellee] is attempting to collect at said company's domicile (Alpharetta—Atlanta, Georgia, USA)." Another expert for Appellee, Dr. Jorge Mora Sanchez, similarly declared that Appellee is not a party to any litigation between Appellant and Ecosalud in Colombia. Upon reviewing the expert legal testimony on both sides, we conclude Appellee is not an integral party in the pending Colombian litigation.

Finally, we draw a contrast between this case, where *lis alibi pendens* is not applicable, and two cases cited by Appellant where the doctrine was applicable. First, *Empresa Colombiana de Recursos Para La Salud, S.A. v. Scientific Games, Inc.,* No. 97-8374 (11th Cir. Jan.27, 1998), and a pending Colombian case dealt with the same issue—whether Ecosalud has the right to enforce the Executable Document, required under Clause 27(3) of the Lottery Contract. *See Empresa Colombiana de Recursos Para La Salud, S.A. v. Scientific Games, Inc.,* No. 1:96-CV-1586-FMH at 19-20 (N.D.Ga. Mar. 17, 1997) (order granting motion to dismiss complaint and amended complaint based in part on *lis alibi pendens* ). These cases also directly involved the same parties—Appellant and Ecosalud. Similarly, *Posner v. Essex Ins. Co.,* 178 F.3d 1209 (11th Cir.1999), and an ongoing suit in Bermuda involved the same issue—the validity and therefore the effect of homeowner insurance policies—and the same parties—a homeowner and an insurance company. *See id.* at 1213. This case and the pending Colombian case directly involve neither the same issues nor the same parties.

For the reasons stated above, we conclude the district court did not abuse its discretion in declining to stay this case based on the doctrine of *lis alibi pendens.*

2.    *Statute of Limitations*

The district court's interpretation of foreign law is a question of law reviewed *de novo. See United States v. Gecas,* 120 F.3d 1419, 1424 (11th Cir.1997); *see also* Fed.R.Civ.P. 44.1 ("The court, in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party .... The court's determination [of foreign law] shall be treated as a ruling on a question of law."); *id.* cmt. ("There is no requirement that the court give formal notice to the parties of its intention to engage in its own research on an issue of foreign law which has been raised by them .... [A]ppellate review [on a question of foreign law]

will not be narrowly confined by the 'clearly erroneous' standard of [Fed.] Rule [Civ. P.] 52(a).").

Colombian law provides that general enforcement proceedings must be brought within 10 years of the act giving rise to the cause of action. *See* Colombian Civil Code § 2536. Colombian law further provides that "ordinary" actions derived from an insurance contract or the provisions governing it must be brought within 2 years from when the interested party knew or should have known of the facts on which the action is based. *See* Colombian Commercial Code on Insurance § 1081. Under Georgia law, an action for breach of contract must be brought within 6 years of the alleged breach. *See* Ga.Code Ann. § 9-3-24 (1982 & Supp.2000).

Appellant contends the 2-year statute of limitations under Colombian law for insurance claims applies to this action. Appellant first argues for the application of Colombian law, generally. Appellant then cites the sworn affidavit of Dr. Abela for the proposition that the Colombia Supreme Court of Justice held the 2-year statute of limitations applies to all actions derived from or related to insurance contracts. Appellant argues the 2-year limitation period covers the Indemnification Agreement since it applies broadly to all insurance-related contracts and since "[n]othing could be more intertwined with insurance than a claim by an insurer against the policy holder, triggered by the payment of a claim to a third party." Appellant submitted at oral argument that the fact that the Indemnification Agreement and the Bond were written on two separate pieces of paper should not control, since the Indemnification Agreement could have been included as a clause in the Bond contract. According to Appellant, the 2-year statute of limitations bars Appellee's claim since Appellee's payment to Ecosalud, which occurred on November 1, 1994, is the latest possible event giving rise to the suit, and the suit was filed on April 2, 1998, more than 2 years later.

Appellee claims Georgia law and its 6-year limitations period apply. Under this theory, Appellee's suit is not barred.[13] The district court agreed with Appellee's point of view, concluding Georgia's 6-year statute of limitations applies.

We begin with the question of whether the 2-year or the 10-year Colombian statute of limitations would apply to this case, assuming *arguendo* that Colombian law applies. Dependent as we are on legal experts to determine which of the Colombian statutes of limitation apply, *see generally Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 539-40, 111 S.Ct. 1489, 1495-96, 113 L.Ed.2d 569 (1991), we observe a "battle of

---

[13]Similarly, under Colombia's 10-year statute of limitations for general enforcement proceedings, Appellee's suit would not be barred.

the experts" in the record. Dr. Abela takes the position that the 2-year statute of limitations applies broadly to all insurance-related suits. Furthermore, he asserts that this case is insurance-related since it involves an insurance company suing its insured for reimbursement under an indemnification agreement. Dr. Abela therefore concludes the 2-year statute of limitations applies to this case. According to Dr. Abela, the Colombia Supreme Court of Justice "held that Section 1081 of the Colombian Commercial Code on Insurance [including the 2-year statute of limitations] applies to all actions that had their support in an insurance contract, whether seeking the satisfaction of the right, or right related to the insurance contract or related to its enforcement or seeking clarification or recognition of the insurance contract." Furthermore, the Supreme Court of Justice "made special note of the independence and special application of [the 2-year statute of limitations] to the prescription of all actions derived from insurance contracts." Dr. Abela cites another decision of the Colombia Supreme Court of Justice which, he testifies, specifies that insurance companies, such as Appellee, are entities that derive rights from insurance contracts under § 1081. According to Dr. Abela, since the 2-year statute of limitations applies to actions "derived or related to insurance," Appellee's claim is barred.

By contrast, Dr. Espinosa takes the position that the 10-year statute of limitations applies. In his view, the Indemnification Agreement is not an insurance contract, should be treated as a general contract, and is therefore governed by § 2536 of the Colombian Civil Code. In his sworn deposition, Dr. Espinosa explains the Indemnification Agreement is not an insurance contract since it was not issued by an insurance company and does not include an obligation to compensate if a loss is suffered. According to Dr. Espinosa, the Indemnification Agreement is a private contract whose reference to the Bond in no way subjects it to the Insurance Code. In fact, Dr. Espinosa explains the Indemnification Agreement cannot be governed by the Insurance Code since insurance contracts are governed exclusively by the Insurance Code and cannot be modified by a private contract. The Indemnification Agreement, as a private contract, is therefore by definition outside the scope of the Insurance Code. In his deposition, Dr. Espinosa expressly disagrees with Dr. Abela's opinion.

Based on our review of this conflicting expert testimony in the record, we conclude the 10-year statute of limitations would apply to this case, assuming *arguendo* that Colombian law governs. We view the Indemnification Agreement as separate and distinct from the Bond. We conclude that the reimbursement

claim under the Indemnification Agreement is not intertwined with the insurance claim under the Bond.[14] We decline to consider the possibility that the Indemnification Agreement *could* have been integrated with the Bond contract. Further, we view the Indemnification Agreement as a generic reimbursement contract that happens to be precipitated by the execution of a separate insurance contract, the Bond. The Indemnification Agreement lacks the elements that characterize an insurance contract, such as issuance of a policy by an insurance company to an insured party, an insured party's obligation to pay a premium, and an insurance company's obligation to compensate for a covered loss. We understand the clause, "actions derived from an insurance contract or the provisions governing it," to mean litigation arising from a relationship founded on an agreement that bears the foregoing, traditional makings of an insurance contract. Colombian Commercial Code on Insurance § 1081. To say that litigation premised on a contract where the insured is obligated to reimburse an insurance company—the opposite of the conventional insurance relationship—is covered by § 1081 of the Insurance Code would be to assign to this statute too attenuated an interpretation.[15]

We therefore conclude the Colombian 10-year statute of limitations, rather than the 2-year statute of limitations, would apply to this case, on the assumption that Colombian law governs this case. Based on this conclusion, we need not reach the question of whether Colombian or Georgia law applies. This case is not barred under either Colombia's 10-year limitation period or Georgia's 6-year limitation period.

B.      *Motion for Summary Judgment*

---

[14]We assume *arguendo,* as asserted by Appellant, that the Bond is characterized as an insurance claim under Colombian law.

[15]We note our review—or attempted review—of decisions of the Colombia Supreme Court of Justice cited by Dr. Abela. The case cited by Dr. Abela in ¶ 30 of his affidavit, dated May 8, 1998, and included in the record in English translation, discusses against whom and under what circumstances the 2-year ordinary and 5-year extraordinary statutes of limitation run pursuant to § 1081 of the Insurance Code. *See Statute of Limitations in Insurance Contracts,* Colombia Supreme Court of Justice, Civil Section, Dr. Jose Maria Esguerra-Samper, Justice in Charge (July 4, 1977). In the course of this discussion, the court explains that the event that triggers the limitations period "is not and cannot be anything other than the loss, which is defined in Article 1072 as 'the realization of the insured risk,' i.e., the occurrence of the future or uncertain act the occurrence of which gives rise to the insurer's obligation to indemnify and correspondingly to the insured or beneficiary's right to receive the indemnification ...." *Id.* at 1. In stating that a loss giving rise to an insurance claim is the *only* event that can trigger the 2-year limitations period, the Colombia Supreme Court of Justice strongly implies that § 1081 applies *solely* to conventional insurance contracts and policies, and not to those merely precipitated by or related to insurance contracts, like the Indemnification Agreement.

The case cited by Dr. Abela in ¶ 25 of his affidavit dated May 8, 1998, *see Contracto de Seguro, Prescripcion de Acciones,* Colombia Supreme Court of Justice, Civil Section, Dr. Alberto Ospina-Botero, Justice in Charge (Mar. 4, 1989), seems not to have been submitted into the record. More significantly, it has not been submitted into the record in English translation. We are therefore unable to consider this case.

We review *de novo* the district court's grant of summary judgment, applying the same standard as the district court. We view all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party, here, Appellant. *See St. Charles Foods, Inc. v. America's Favorite Chicken Co.,* 198 F.3d 815, 819 (11th Cir.1999). "Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *McCaleb v. A.O. Smith Corp.,* 200 F.3d 747, 750 (11th Cir.2000) (citing Fed.R.Civ.P. 56(c)).

Appellant argues this case presents several issues of fact which preclude the entry of summary judgment. The purported issues of fact are as follows: (1) whether the term of the Bond was renewed and, therefore, in effect when the Declaration of Caducity was issued; (2) whether the Indemnification Agreement was in effect when the Declaration was issued; (3) whether Appellee was obligated to pay under the terms of the Bond; and (4) whether Appellee's settlement with Ecosalud was reasonable as a matter of law. We address each asserted issue of fact and conclude no issue of material fact has been raised. We affirm the grant of summary judgment and the principal judgment in the amount of $2.4 million.

1.     *Renewal of Bond*

Appellant argues that Appellee renewed the term of the Bond without authorization from Appellant, thereby unilaterally increasing the scope of the risk Appellant faced under the Indemnification Agreement. Appellant also claims Appellee sought additional security from Appellant as a condition to renewing the Bond. Appellant argues this unilateral risk increase and demand for additional security preclude Appellee's claim that Appellee had an obligation to renew the Bond automatically. Appellant next cites Ecosalud's apparent threat to cancel the Lottery Contract as evidence that the Bond was not meant to renew automatically. According to Appellant, the Bond could not have been renewed since Appellant did not supply additional security and did not pay a premium for the Bond. It follows that there is at least a question of fact as to whether the Bond was in effect when the Declaration was issued.

Appellee argues both parties agreed to an amendment to the Bond, dated May 15, 1992, under which the Bond automatically renewed every year that the Lottery Contract remained in effect, as well as the year following the contract's expiration. According to Appellee, this amendment brought the Bond into compliance with Clause 41(a) of the Lottery Contract. Appellee explains that Wintech, the entity created by Appellant and two other companies to implement the Lottery Contract, paid the premium for the renewed Bond. Since performance of the Lottery Contract required the maintenance of the Bond, Wintech had the

contractual obligation, and thus express authority from Appellant, to pay for the Bond's renewal. Appellee contends Appellant's allegations that Appellee sought additional security and that Ecosalud threatened to cancel the Lottery Contract are irrelevant in light of the express contractual provisions. According to Appellee, no terms beyond those in the amendment were added to the Bond, and it was properly renewed in accordance with its existing terms.

We agree with Appellee that there is no factual question as to whether the Bond was renewed. We have reviewed the affidavit of C. Gray Bethea, Jr., Appellant's General Counsel, wherein Mr. Bethea declared under oath that Wintech sought to have Appellant sign a blank promissory note as a condition to obtaining a new Bond and that Appellee, through Wintech, sought other assurances from Appellant that it would issue security to Appellee. Mr. Bethea declared, "[Appellant] did not agree to renew or replace the security for the Guarantee Bond, nor did [Appellant] pay the premium for the new bond." We have also reviewed a letter from Wintech to Appellant which mentions Ecosalud's alleged statement that it would cancel the Lottery Contract if the Bond was not renewed shortly.

Parol evidence such as that described above, however, cannot be considered in the face of an unambiguous, written guaranty agreement. *See Rizk v. Jones,* 148 Ga.App. 473, 251 S.E.2d 360, 361 (1978) ("The cases are legion that a complete and unambiguous instrument cannot be varied or contradicted by reliance upon inconsistent parol statements.") (internal quotation marks and citations omitted), *aff'd,* 243 Ga. 545, 255 S.E.2d 19 (1979); *Health Serv. Ctrs. v. Boddy,* 257 Ga. 378, 359 S.E.2d 659, 661 (1987) ("Where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to the find the intention of the parties."); *American Viking Contractors, Inc. v. Scribner Equip. Co.,* 745 F.2d 1365, 1371 (11th Cir.1984) (applying Georgia law); *see also In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir.1981) ("Ordinarily, we should glean the contract's meaning without resorting to extrinsic evidence in accordance with the principle that the language of an agreement, unless ambiguous, best represents the intention of the parties.").[16] Since the text of the amendment whereby Appellee promised to renew the Bond automatically is unambiguous, we decline to consider Mr. Bethea's affidavit and Wintech's letter to

---

[16]The parol evidence rule is a substantive rule of law to which the *Erie* doctrine applies. *See, e.g., MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino, S.p.A.,* 144 F.3d 1384, 1388-89 (11th Cir.1998); *Conway v. Chem. Leaman Tank Lines, Inc.,* 540 F.2d 837, 839 (5th Cir.1976); *Schewe v. Bentsen,* 424 F.2d 60, 62 (5th Cir.1970). This Court has not been advised of any contrary legal doctrine in Colombia which would apply in this case.

Appellant.[17] This amendment, dated May 15, 1992, provides, "[Appellee] promises to automatically renew this policy at the end of each period until the end of the term of effectiveness of [the Lottery Contract], entered into with Ecosalud, S.A. and one year more, including the extensions thereof. The taker [Wintech] promises to pay the respective premiums." This amendment unambiguously obligated Appellant and Appellee to renew the Bond automatically every year until the expiration of the Lottery Contract, plus one year. The Lottery Contract was to remain in effect through June 12, 1997, under Clauses 2 and 68 of the Contract. In fact, the record shows the parties complied with this amendment by agreeing to another amendment, dated March 2, 1993, by which they extended the Bond for another year, from March 12, 1993, through March 12, 1994. Under the express terms of these amendments, the Bond was in effect when the Declaration of Caducity was issued on July 1, 1993.

Moreover, the amendment obligating the automatic renewal of the Bond was expressly agreed to in compliance with Clause 41(a) of the Lottery Contract. This clause provides, "This bond shall remain in effect for the entire term of this Agreement, including any extensions thereof, and for one additional year." As noted above, the Lottery Contract was to be effective through June 12, 1997. Appellant's apparent belief that the Bond need not have been renewed is therefore questionable under the express terms of the Lottery Contract to which Appellant was a party.

As to Appellant's question of how the Bond was renewed, Appellant concedes that "[t]he evidence suggests, but does not confirm, that Wintech paid the premium for the Bond ...." We agree that Wintech paid the premium, since Appellant, PKI Associates, and Daibutsu, Inc., the companies that formed Wintech, are listed as the contractors on the Bond amendment that extended the Bond through March 12, 1994.

Appellant argues, however, that Wintech was not a party to the Bond and was not insured by it. This argument appears to be based on the fact that only Appellant is listed as the contractor for the Bond policy dated March 12, 1992, and effective from that date to March 12, 1993. However, this policy had expired when the Declaration of Caducity was issued on July 1, 1993. At that time, the effective policy was the amendment extending the Bond through March 12, 1994, and Appellant, PKI, and Daibutsu are all listed as contractors on this document. Furthermore, Clause 41 of the Lottery Contract required Appellant, PKI, and

---

[17]In any case, we note Mr. Bethea's affidavit discusses only Appellee's *seeking* to effect changes in the terms of the Bond; it does not refer to any actual changes to these terms. Additionally, we fail to see the significance of Ecosalud's apparent belief that the Bond would not be automatically renewed, as Ecosalud is not a party to the Bond.

Daibutsu to furnish a Bond which was required to remain effective through June 12, 1998. We conclude that the Bond was properly renewed, and there is no question of material fact as to whether the Bond was in effect when the Declaration of Caducity was issued.

2.    *Effectiveness of Indemnification Agreement*

Appellant argues the Indemnification Agreement had a term of one year, and the absence of an automatic renewal provision in the Agreement should be construed to limit the Agreement to this term. Appellant claims it never consented to an extension of the Agreement, and nothing on the face of the Agreement would permit Appellee to extend the term of the Agreement unilaterally. According to Appellant, it is therefore questionable whether the Indemnification Agreement was in effect when the Declaration of Caducity was issued.

Appellee argues the express language of the Indemnification Agreement ties its term of effectiveness to that of the Bond. The extension of the term of the Bond therefore extended the term of the Indemnification Agreement.

We agree with Appellee. The Indemnification Agreement provides, "The validity of this document shall be broad, and it shall remain in effect for a term equal to that of the bonds issued by [Appellee] ." The Bond was extended through March 12, 1994, and Appellee was obligated to automatically renew it on an annual basis through June 12, 1998. *See supra* Part II.B.1. According to its express language, the Indemnification Agreement was likewise extended through March 12, 1994, and subject to automatic renewal. The Indemnification Agreement was therefore in effect when Ecosalud issued the Declaration of Caducity.[18]

3.    *Obligation to Pay Under the Bond*

The Indemnification Agreement requires Appellant "to immediately reimburse [Appellee] for any

---

[18]Appellant argues that reaching this conclusion would require us to improperly "revise or supplement an agreement under the guise of contract construction." *Sosebee v. McCrimmon,* 228 Ga.App. 705, 492 S.E.2d 584, 586 (1997). In *Sosebee,* the contract expressly mentions one specific situation, while the case involves a wholly different situation about which the contract is silent. *Id.* Here, by contrast, the Indemnification Agreement broadly states its term of effectiveness, without excluding any specific circumstances.

As discussed above, *see* Part II.B.1, parol evidence cannot to be considered in the face of an unambiguous, written agreement. *See Rizk,* 251 S.E.2d at 361; *Health Serv.,* 359 S.E.2d at 661; *American Viking,* 745 F.2d at 1371; *see also Stratford,* 635 F.2d at 368. We therefore do not address the testimony of Dr. Abela in his third affidavit that the term of the Indemnification Agreement "would be equal to the term of the Guarantee Bond issued by [Appellee], that is one year." Neither do we consider Mr. Bethea's affidavit testimony that "[a]t no time did I ever think that the Indemnity Agreement extended beyond the one-year term of the Guarantee Bond."

sums that it pays to ... ECOSALUD, in accordance with the terms of ... [the Bond] as indemnification for losses and any other expenses or costs derived from said Performance Bonds." The Bond requires Appellee to pay Ecosalud when an issued Declaration of Caducity becomes "final and binding." The question, therefore, is whether the Declaration of Caducity is "final and binding," thereby obligating Appellee to pay Ecosalud under the terms of the Bond and, in turn, obligating Appellant to reimburse Appellee under the terms of the Indemnification Agreement. As discussed above, *see* Part I, Ecosalud issued a Declaration of Caducity, Resolution No. 246, on July 1, 1993, and affirmed this Declaration with Resolution No. 493, on October 15, 1993.

Appellant first argues the Declaration of Caducity cannot be final since it is subject to the outcome of a pending administrative proceeding initiated by Appellant and Wintech in Colombia. Second, Appellant argues the Declaration was not final and Appellee did not have an obligation to pay Ecosalud $4 million since Appellee's property was never subject to imminent foreclosure. Specifically, Ecosalud never took formal action to seize or foreclose upon Appellee's property. Even were Appellee's property subject to seizure, Ecosalud would have had to initiate a foreclosure proceeding in the Colombian Special Courts and obtain an administrative order. Appellant believes that, during this process, Appellee would have had the opportunity to defend against foreclosure by posting a bond or a deposit in court. Appellant also contends Appellee could have sought a stay of any potential enforcement of the Declaration.

Appellee argues that, at the time it made payment to Ecosalud, the Declaration of Caducity was final and subject to execution. Appellee had the right, under Colombian law, to appeal the Declaration and, in fact, initiated such an appeal. According to Appellee, the Declaration became final and subject to execution when Ecosalud confirmed the Declaration by issuing Resolution No. 493. Appellee contends the pending litigation challenging the Declaration does not affect the Declaration's finality. In Appellee's view, only the entry of a stay would do so, and the Colombian administrative judge declined to issue a stay in this case.

Based on our review of the expert testimony in the record, we agree with Appellee. In support of Appellee's position, Dr. Ramon del Villar, a legal expert for Appellee, declared:

> When Resolution 0246 was affirmed by Resolution 0493, it became[ ] firm, final and subject to execution by itself.... This possibility of execution ... was not stayed because those resolutions were being challenged in an administrative tribunal.... I consider that once the administrative ruling became final, [Appellee] had to pay the amount agreed on the policy .... After the Tribunal denied the temporary stay, [Appellee] was under an even greater pressure to pay Ecosalud to prevent execution and therefore attachment of its property.

Dr. Carlos Betancur Jaramillo, another legal expert for Appellee, similarly testified that Resolution No. 493

rendered the Declaration final and executable. In his words, "As soon as the Resolution No. 246 was made final by a decision of [Resolution No.] 493, the act acquired executory right and it could be used to execute the debtors ." Dr. Betancur explained that Resolution No. 246 was not final and enforceable prior to the issuance of Resolution No. 493. Dr. Jorge Mora Sanchez likewise averred that as a result of the issuance of Resolution No. 493, Resolution No. 246 "became final and subject to execution.... [Therefore,] the assets of [Appellee] ... were subject to levy and seizure if [Appellee] did not pay the US$ 4,000,000."

Appellant relies heavily on the testimony of Dr. Abela to support its position that the Declaration was not final when Appellee made payment to Ecosalud. Nowhere, however, did Dr. Abela state that Resolution No. 246 was not final subsequent to the issuance of Resolution No. 493. Dr. Abela testified that an "administrative act could be subject to a judicial challenge before the competent administrative courts, which will, ultimately, decide on its validity." In addition, Dr. Abela explained, "[T]hese administrative acts are bound to the final outcome of said litigation [challenging the validity of the Declaration of Caducity], which is still in process." Although Dr. Abela testified that, subsequent to Ecosalud's dismissal of Appellee's challenge to the Declaration, the administrative courts can determine whether the Declaration is *valid,* he did not claim that such a judicial challenge renders the Declaration not *final.* We therefore deem Dr. Abela's testimony consistent with our conclusion that Resolution No. 493 rendered the Declaration "final and binding," albeit subject to the outcome of the pending litigation. We conclude there is no factual issue as to whether Appellee was obligated to pay Ecosalud under the terms of the Bond.[19]

4.      *Reasonableness of Settlement*

Appellant argues a factual question persists as to whether Appellee's settlement with Ecosalud for payment of $2.4 million was reasonable, since negotiations were allegedly conducted without Appellant's notification or participation. Appellant claims it was notified of the settlement only after the negotiations concluded.

Appellee argues it was obligated to pay Ecosalud $4 million upon the issuance of Resolution No. 493,

---

[19]We determine Appellant misses the point in arguing the Declaration was not final because Appellee's property was not subject to imminent foreclosure and, in any event, Appellee would have had various opportunities to resist such foreclosure. Once the Declaration became final and enforceable upon the issuance of Resolution No. 493, Appellee was obligated to Ecosalud for $4 million, regardless of the steps Ecosalud took to enforce this payment and regardless of the optional recourses available to Appellee. Appellee owed Appellant no duty to delay meeting its obligation to Ecosalud. In any case, Appellee did initiate a challenge to the Declaration. In the mean time, Appellee acted properly and responsibly in meeting its obligation to Ecosalud pursuant to the Declaration of Caducity.

and its negotiated settlement with Ecosalud was an effort to mitigate its damages. Appellee maintains that, absent the settlement, it would be seeking a reimbursement of $4 million, not $2.4 million. Appellee believes this reduction in liability to be reasonable, as it benefits both Appellee and Appellant. Appellee explains that, after the Declaration was issued, it notified Appellant that Appellee's property was subject to attachment. Furthermore, after Resolution No. 493 was issued, Appellee notified Appellant that the obligation was payable.[20]

We agree with Appellee that the settlement was reasonable. Appellant cites the rule that "an indemnitee, after giving the indemnitor notice and an opportunity to defend, could settle a lawsuit and claim indemnity upon a showing that the decision to settle was reasonable." *Southern Ry. v. Georgia Kraft Co.,* 823 F.2d 478, 480 (11th Cir.1987). This rule does not apply here. This principle governs only where there is a lawsuit filed by a third party against an indemnitee, and the indemnitee settles with the third party and demands payment from the indemnitor. *See id.* In other words, the rule applies only where a claim has been filed against the indemnitee, but no final judgment has been entered against the indemnitee. In such situations, as in *Southern Railway,* absent the settlement, there would be no current obligation to pay the third party and thus no current indemnification obligation. The indemnitee, therefore, must show the reasonableness of the settlement to guard against the possibility that the indemnitee could increase the obligation of the indemnitor for the benefit of the indemnitee.[21]

Here, by contrast, a final and executable obligation to pay Ecosalud $4 million was imposed on Appellee, the indemnitee. *See supra* Part II.B.3. Due to Appellee's obligation to pay, Appellant was obligated to indemnify Appellee for the full $4 million Appellee expended. We conclude that Appellee's settlement with Ecosalud, which reduced Appellee's obligation to Ecosalud from $4 million to $2.4 million, was inherently reasonable with respect to Appellant, since this reduction in Appellee's obligation reduced, in turn, Appellant's obligation to Appellee from $4 million to $2.4 million. The key here is that, absent the settlement, Appellant would have been obligated to Appellee in the amount of $4 million. Under these circumstances, Appellee need not make an explicit showing of reasonableness. Appellee also was not

---

[20]We note that Appellant does not acknowledge Appellee's notification subsequent to the issuance of Resolution No. 493, nor does Appellee mention its post-settlement demand for reimbursement from Appellant.

[21]For example, the indemnitee could settle a case that would likely have been won on the merits in order to avoid the disturbance and expense of litigation.

obligated to notify Appellant that settlement negotiations had begun or to accept Appellant's input in the settlement process, as was required in *Southern Railway*.[22]

C.      *Interest Judgment*

Contract interpretation without resort to parol evidence is a question of law reviewed *de novo*. *See Luckie v. Smith Barney, Harris Upham & Co.,* 999 F.2d 509, 512 (11th Cir.1993); *Stratford,* 635 F.2d at 368. Based on its interpretation of the interest provision in the Indemnification Agreement, the district court ordered Appellant to pay interest on the $2.4 million principal judgment at an annual rate of 38.76%, which was the Colombian bank interest rate for pesos on November 1, 1994, the date of Appellee's payment to Ecosalud.

Appellant argues that applying the 38.76% rate to dollars, rather than to pesos, grants Appellee a windfall. Appellant maintains the judgment day rule, which governs obligations in foreign countries and in foreign currencies, should apply, as the transaction occurred in Colombia, and Ecosalud recognized the receipt of funds in pesos. Under this approach, the district court would have applied the 38.76% interest rate to the pesos equivalent of $2.4 million and then converted the sum of principal plus interest into dollars as of the date of judgment. The effective interest rate would then be 4.22%. Alternatively, if Appellee is correct that Appellant was obligated to pay in U.S. dollars, Appellant argues a dollar transaction should carry a different interest rate than a peso transaction. The interest judgment should, therefore, be set aside due to Appellee's failure to prove the Colombian bank interest rate on dollar transactions.

Appellee argues the district court's application of the 38.76% rate to dollars should be affirmed. Appellee contends the payment should be considered in terms of dollars and the judgment day rule should not apply. Appellee points out, *inter alia,* the Indemnification Agreement references sums paid under the Bond which states the insured amount as "US$ 4,000,000," and Ecosalud's official receipt references a check for 1.00626 billion pesos exchanged for $1.2 million, and two checks for $300,000 and $900,000, respectively. Appellee next argues the interest rate unambiguously set forth in the Bond is 38.76%—the Colombian banking interest rate on November 1, 1994. Appellee contends the application of any other rate would rewrite the Bond contract.

We hold the district court erred in applying a 38.76% annual interest rate to the $2.4 million principal

---

[22]We need not address Appellant's arguments that the Colombian Attorney General's failure to approve the settlement supports the unreasonableness of the settlement and that there is no evidence in the record regarding Appellee's alleged liquidity problems.

judgment. We reach the following conclusions: (1) the Bond and the Indemnification Agreement contemplated payment in U.S. dollars, and (2) the applicable interest rate is therefore that which Colombian banks would have applied to U.S. dollar deposits on November 1, 1994. Our conclusions are grounded wholly in the language of the Bond and the Indemnification Agreement.

First, we conclude these contracts require Appellant to reimburse Appellee in U.S. dollars. The Indemnification Agreement provides, "[Appellant] agrees to immediately reimburse [Appellee] for any sums that it pays to [Ecosalud] in accordance with the terms of ... the 'Performance Bonds' ...." Every Bond policy issued sets forth "US$4,000,000" as the "Insured Amount" or the "Present Insured Amount." The express terms of these agreements therefore show the payable amount in U.S. dollars. In light of this express language, we attach no significance to the disputed intent of the parties, which is allegedly manifested in Ecosalud's written receipt and Appellee's checks. *See Rizk,* 251 S.E.2d at 361; *Health Serv.,* 359 S.E.2d at 661; *American Viking,* 745 F.2d at 1371; *see also Stratford,* 635 F.2d at 368. Given our conclusion that reimbursement was required in dollars, we decline to apply the judgment day rule, as urged by Appellant.

Second, the Indemnification Agreement provides, "The sums paid by [Appellee] to ECOSALUD in accordance with the Performance Bonds shall accrue interest at the current banking interest rate in effect in Colombia." The "current banking interest rate in effect in Colombia" may be different for peso deposits than it is for U.S. dollar deposits. There is no valid reason that the "current banking interest rate" must denote one numerical rate for all deposits, regardless of currency. The most straightforward way to understand "current banking interest rate" is the interest rate a Colombian bank would apply, as a matter of course, to a deposit of any given currency. From this record, we do not know the interest rate a Colombian bank would apply to U.S. dollar deposits.[23] We therefore remand for the district court to make this factual determination.[24] We hold the district court should apply the interest rate that a Colombian bank would have applied to a U.S. dollar deposit on November 1, 1994. In so holding, we do not rewrite the Bond agreement; to the contrary, we

---

[23]Appellee relies on testimony by Dr. Jorge Mora Sanchez in which he states, "The normal banking interest rate in effect on 1 November 1994 in Colombia was 38.76 percent per annum." Since the Indemnification Agreement is not ambiguous, we need not address this parol evidence. *See Rizk,* 251 S.E.2d at 361; *Health Serv.,* 359 S.E.2d at 661; *American Viking,* 745 F.2d at 1371; *see also Stratford,* 635 F.2d at 368. Furthermore, we do not accept the premise underlying Dr. Sanchez's statement—that the 38.76% interest rate for pesos automatically applies to U.S. dollars as well.

[24]It would make sense that Colombian banks do not apply the same interest rate to peso deposits as to dollar deposits, and that Colombian banks take into account the dollar-peso exchange rate in determining the interest rate applied to U.S. dollar deposits. Nevertheless, we make no assumptions here and remand to the district court to make these factual findings.

fulfill its plain meaning.

## III. CONCLUSION

As an initial matter, we affirm the district court's denial of Appellants' motion to dismiss. We conclude the district court did not abuse its discretion in declining to stay this case based on the principle of *lis alibi pendens*. Additionally, we conclude this case is not barred by the statute of limitations, regardless of whether Colombian or Georgia law governs. If Colombian law governs, the 10-year statute of limitations for general enforcement proceedings would apply. If Georgia law governs, the 6-year limitation period for contracts would apply. Either way, this suit is not time barred.

Reaching the merits, we affirm the district court's grant of summary judgment and its award of a principal judgment in the amount of $2.4 million. We conclude Appellant failed to raise an issue of material fact. Specifically, we determine the following: (1) the Bond was renewed; (2) the Bond and the Indemnification Agreement were in effect when the Declaration of Caducity was issued; (3) Appellee was obligated to pay under the Bond; and (4) Appellee's settlement with Ecosalud was reasonable.

Finally, we conclude the district court erred in applying an annual, prejudgment interest rate of 38.76%. We therefore vacate the penultimate paragraph of Part III of the district court's order dated September 28, 1999, the final 12 words of Part III of the order, the order's direction to enter judgment for interest at an annual rate of 38.76%, and the judgment's award of interest at this rate. Furthermore, we remand for the district court to determine the interest rate Colombian banks would have ordinarily applied to a deposit of U.S. dollars on November 1, 1994, and to recalculate the interest judgment against Appellant according to this rate.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.